FILED
2017 Dec-19  AM 11:37
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHERN DIVISION

| | |
|---|---|
| AMANDA CURETON, )<br><br>   **Plaintiff,** )<br><br>**v.** )<br><br>UNUM GROUP )<br>CORPORATION f/k/a UNUM )<br>PROVIDENT CORPORATION; )<br>UNUM LIFE INSURANCE )<br>COMPANY OF AMERICA; and )<br>EGLIN FEDERAL CREDIT )<br>UNION PLAN )<br><br>   **Defendants.** | **CIVIL ACTION NO.**<br><br>_____ |

## COMPLAINT

Plaintiff Amanda Cureton ("Plaintiff") brings this action for violations of the Employee Retirement Income Security Act of 1974 committed by Unum Group Corporation, f/k/a UnumProvident Corporation and Unum Life Insurance Company of America (collectively "UnumProvident") relating to the provision of ERISA-governed disability benefits under the Eglin Federal Credit Union Plan ("the Plan") sponsored by Plaintiff's former employer, Eglin Federal Credit Union

1

("EFCU"). In support of the relief requested herein, Plaintiff alleges the following upon personal knowledge as to herself and as to all other matters upon information and belief based upon, *inter alia*, the investigation made by and through her attorneys:

## INTRODUCTORY STATEMENT

1.    This is an action for legal and equitable relief seeking redress of violations of the Employee Retirement Income Security Act (hereinafter referred to as "ERISA"). This suit is brought pursuant to 29 U.S.C. § 1132(a), to secure disability benefits due to Plaintiff through an ERISA welfare benefits plan sponsored by EFCU and insured through a group insurance policy (hereafter, "the Plan") issued by UnumProvident.

2.    The Plaintiff seeks any and all benefits to which she may be entitled should this Court determine she is "disabled" under the terms of the Plan. Such benefits include all other available long-term disability benefits; waiver of premium benefits under disability, life, accidental death and dismemberment or accident policies issued or administered by UnumProvident; and any other benefits available through The Plan,

including those managed, administered or underwritten by UnumProvident.

3. Plaintiff seeks benefits based on the conditions documented in her medical records and other information before UnumProvident. Plaintiff's disabling conditions arise from a constellation of conditions that have grown over time as Plaintiff's health has continued to deteriorate since she became unable to continue working in early 2012. Her diagnosed conditions include Chronic Adhesive Disease; immunoglobulin light chain deficiency (an immunodeficiency disorder); interstitial cystitis with bladder prolapse; fibromyalgia; recurrent bacterial and fungal infections (because of the immune disorder); dysautonomia; pelvic floor dysfunction; sacroiliac joint dysfunction; sacroiliitis; lumbar radiculopathy; low back pain; chronic pain syndrome; and irritable bowel syndrome ("IBS").

4. These conditions leave her having to self-insert a catheter up to four times each day because her bladder cannot evacuate otherwise and suffering from debilitating pain, weakness, fatigue and swelling in her extremities. She also cannot walk or stand for appreciable lengths of

time without assistance, nor can she remain seated for very long without having to change positions or rest altogether.

## JURISDICTION

5.    Jurisdiction is appropriate under 28 U.S.C. § 1331 in that 29 U.S.C. §1132(e) confers jurisdiction upon the district courts of the United States where, as here, Plaintiff's claims relate to an "employee welfare benefit plan" and/or an "employee pension plan" as those terms are defined within 29 U.S.C. § 1001, et. seq. The Plan "may be found" within this district.

6.    Jurisdiction is further appropriate under 28 U.S.C. § 1332 in that the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and diversity of citizenship exists between the parties.

7.    Venue is appropriate in this District Court pursuant to 29 U.S.C. § 1132(e)(2), in that the employee welfare benefit plan at issue was at least partly administered in this District, the breaches of duty alleged herein occurred in this District, and the Defendant may be found or reside in this District and, pursuant to 28 U.S.C. § 1391(b), in that the cause of action arose in this District.

## PARTIES

8.    As of the filing of this Complaint, Plaintiff Amanda Cureton is a resident citizen of Alabama and this District.

9.    Defendant Unum Group Corporation is a foreign corporation that does business by agent or otherwise in all counties in Alabama.

10.    Defendant Unum Group Corporation is a "fiduciary" of The Plan as that term is defined by 29 U.S.C. § 1002(21).

11.    One of Unum Group Corporation's designated agents for service of process is:

> Corporation Service Company, Inc.
> Registered Agent for UNUM Group Corporation
> 641 South Lawrence Street
> Montgomery, AL  36104

12.    Unum Group Corporation is an entity exercising authority or control respecting the management or disposition of The Plan assets or the personnel exercising said authority over The Plan assets.

13.    Unum Group Corporation is an entity providing services to The Plan at issue.

14.    Unum Group Corporation is an entity meeting ERISA's definition of a "party in interest" in this case as that term is defined by 29 U.S.C. § 1002(14).

15.   Defendant Unum Life Insurance Company of America is a foreign corporation that does business by agent or otherwise in all counties in Alabama.

16.   Unum Life Insurance Company of America is a "fiduciary" of The Plan as that term is defined by 29 U.S.C. § 1002(21).

17.   One of Unum Life Insurance Company of America's designated agents for service of process is:

> Corporation Service Company, Inc.
> Registered Agent for UNUM Group Corporation
> 641 South Lawrence Street
> Montgomery, AL  36104

18.   Unum Life Insurance Company of America is an entity exercising authority or control respecting the management or disposition of The Plan assets or the personnel exercising said authority over The Plan assets.

19.   Unum Life Insurance Company of America is an entity providing services to The Plan at issue.

20.   Unum Life Insurance Company of America is an entity meeting ERISA's definition of a "party in interest" in this case as that term is defined by 29 U.S.C. § 1002(14).

21.    Unum Life Insurance Company of America contracted with or presently has a contract for services with Defendant Unum Group Corporation, where Unum Group Corporation performs administrative functions for the Plan.

22.    Unum Life Insurance Company of America relies on employees provided through Unum Group Corporation for administrative functions for the Plan at issue.

23.    Eglin Federal Credit Union Plan ("The Plan") is an "employee welfare benefit plan" as defined within 29 U.S.C. § 1001, et. seq., and may be served with process by serving:  Eglin Federal Credit Union Plan, 838 Eglin Parkway NE, Ft. Walton Beach, FL 32547.

## THE PLAN

24.    Upon information and belief, The Plan at issue was funded, at least in part, by a long-term disability insurance policy sold by Unum Life Insurance Company of America, the company which also underwrote the policy.

25.    This long-term disability policy was purchased by Plaintiff's employer for the purpose of conferring a benefit upon Plaintiff and other employees.

26.   As a result, this policy qualifies as an employee welfare benefit plan as defined in 29 U.S.C. § 1002(1), and Plaintiff qualifies as a participant and/or beneficiary under The Plan as that term is used in 29 U.S.C. § 1132.

27.   Under the terms of The Plan providing for disability benefits, Plaintiff is "disabled" as defined by The Plan.

28.   On information and belief, although the Plan purports to confer discretion to Unum Life Insurance Company of America, the employees that administered Plaintiff's claim either were employed by a different entity or acted under the direction or control of Unum Group Corporation pursuant to a general services agreement, notwithstanding them having presented themselves to Plaintiff as employees of Unum Life Insurance Company of America.

## UNUMPROVIDENT'S LIABILITY

29.   Amanda Cureton began working for EFCU in Pensacola, Florida on July 17, 2007, where her performance and dedication eventually resulted in her serving as a branch manager.

30.   Ms. Cureton's responsibilities as Branch Manager included, among other things, supervising all personnel within the branch,

overseeing branch operations and securing and properly accounting for all cash and other assets, and customer relations.

31.   Several years into her job, Ms. Cureton developed a condition known as adhesive disease which comes with significant bladder problems.

32.   She also developed interstitial cystitis with bladder prolapse and exhibited a history of fibromyalgia, which caused her significant pain and other problems.

33.   In December 2011, Ms. Cureton underwent a vaginal hysterectomy.

34.   Following the surgery, Ms. Cureton attempted to return to work, but continued to experience significant pain, fatigue and other problems (including significant bladder issues) stemming from her adhesive disease and myalgias.

35.   After it was clear there would be no meaningful improvement in her functionality enabling her to return to work, Ms. Cureton applied for long-term disability benefits under EFCU's LTD plan which UnumProvident both administered and insured on March 15, 2012.

36.   Her physicians Dr. Jennifer Bisson and Dr. Christopher Cave,

who were in the same practice, reported to UnumProvident on her claim form the following: "pelvic pain, bladder problems, fatigue and exhaustion relating to chronic fatigue syndrome, aches and pains with fibromyalgia."

37.   Further, Dr. Bisson and Dr. Cave reported to UnumProvident that the ultimate result of Ms. Cureton's conditions was as follows:

RESTRICTIONS: no physical exhertion, no bending lifting or twisting, for every 1 hr of sitting walk 5 min, for every hour of standing lay down 15 minutes, no lifting over 10 lbs, rest as needed

LIMITATIONS: Patient experiences severe pain from adhesive disease documented with surgery 12/9/11. Due to pain requires significant periods of rest without physical exhertion. Bladder requires patient to take medicine as needed for spasms which does not allow her to drive.

38.   UnumProvident acknowledged receipt of the claim in a letter dated March 21, 2012 and indicated it would perform an investigation before deciding whether to approve Ms. Cureton's benefit.

39.   After the conclusion of that investigation, UnumProvident found Ms. Cureton to be disabled under the terms of her policy from working in her own occupation, finding that although her occupation was sedentary, her restrictions and limitations reported by her doctor indicating that she could not balance, stoop, kneel or even occasionally walk or stand and that she required frequent rest entitled her to benefits under the Plan.

40.   UnumProvident informed EFCU and Ms. Cureton of the approval in letters dated April 6, 2012.

41.   The claims team assigned to Ms. Cureton also quickly began constantly seeking updated information from her and her health providers as to her conditions and treatments on almost a monthly basis, and it was regularly provided this information which showed her condition to remain constant in some areas and worse in others.

42.   For example, she continued to experience significant pain with sitting, standing or walking because of her prolapse, among other things.

43.   Also, her fatigue had not improved, and she had begun experiencing weakness in her arms and hands.

44.   Over this time, UnumProvident even required Ms. Cureton to accommodate in her family's home a private investigator the company had hired through HUB Enterprises for an in-person interview, where the investigator also took numerous pictures of Ms. Cureton, her home and even her belongings.

45.   As Ms. Cureton's ongoing benefit claim reached the two-year mark, the UnumProvident claims team responsible for her benefit

administration announced to Ms. Cureton that it was undertaking a new review and investigation to determine whether Ms. Cureton continued to qualify for her LTD benefit when the Plan's disability definition switched from being based on whether Ms. Cureton could perform the material and substantial duties of her regular occupation to whether she could perform such duties in *any* occupation for which she could qualify by way of training, education and experience.

46.   In response to even more requests for updated information and assessments, Ms. Cureton's medical providers furnished their records and requested professional medical opinions.

47.   Dr. Bisson, Ms. Cureton's principal treatment provider at the time, reported a January 2013 statement requested by UnumProvident:

---

**Physical Restrictions and/or Limitations**

If your patient has CURRENT PHYSICAL RESTRICTIONS (activities patient should not do) and/or PHYSICAL LIMITATIONS (activities patient cannot do) list below. Please be specific and understand that a reply of "no work" or "totally disabled" will not enable us to evaluate your patient's claim for benefits and may result in us having to contact you for clarification.

Cannot bend, squat, climb, or lift > 10 lbs.
Cannot stand or walk continuously.
Can only sit short-term in one position.
Cannot urinate normally due to severity of bladder prolapse, IC, and pain.

Please provide the duration of these restrictions and limitations. From (mm/dd/yy) 12/09/11  To (mm/dd/yy) present

**Behavioral Health Restrictions and/or Limitations**

If your patient has CURRENT BEHAVIORAL HEALTH RESTRICTIONS (activities patient should not do) and/or BEHAVIORAL HEALTH LIMITATIONS (activities patient cannot do) please list below. Please be specific and understand that a reply of "no work" or "totally disabled" will not enable us to evaluate your patient's claim for benefits and may result in us having to contact you for clarification.

Cannot tolerate high (or even moderate) amount of work-stress due to impact on medical conditions
Cannot work in any capacity due to anxiety and insomnia as a direct result of fibromyalgia.

Please provide the duration of these restrictions and limitations. From (mm/dd/yy) 12/09/11  To (mm/dd/yy) present

48.    Despite this report, in a February 2013 "roundtable" involving the UnumProvident team assigned to Ms. Cureton's benefit administration, it was decided that this and similar reports were not sufficient by themselves to support an eligibility determination and that they needed to defer making an official determination until Ms. Cureton had completed her forthcoming course of care at the Mayo Clinic, to which she traveled with family at significant personal expense to find some degree of improvement.

49.    In the meantime, UnumProvident continued to encourage Ms. Cureton to apply for SSDI so that it could apply any such award towards its ongoing benefit liability.

50.    Also during this time, UnumProvident continued to badger Ms. Cureton's treating physicians with more requested "statements" about restrictions and limitations, but each form returned remained consistent. Dr. Bisson's April 26, 2013 is an example, where she reports (again) as follows:

> Physical Restrictions and/or Limitations
>
> If your patient has CURRENT PHYSICAL RESTRICTIONS (activities patient should not do) and/or PHYSICAL LIMITATIONS (activities patient cannot do) list below. Please be specific and understand that a reply of "no work" or "totally disabled" will not enable us to evaluate your patient's claim for benefits and may result in us having to contact you for clarification
>
> *Patient unable to perform sustained walking, standing or even sitting due to chronic muscle pains and fatigue.*

51.    This time, she also noted a related psychiatric component, which she described as follows in response to a query about her assessment of Ms. Cureton's "behavioral health":

> Behavioral Health Restrictions and/or Limitations
>
> If your patient has CURRENT BEHAVIORAL HEALTH RESTRICTIONS (activities patient should not do) and/or BEHAVIORAL HEALTH LIMITATIONS (activities patient cannot do) please list below. Please be specific and understand that a reply of "no work" or "totally disabled" will not enable us to evaluate your patient's claim for benefits and may result in us having to contact you for clarification.
>
> *Patient's depression and anxiety diagnoses make it impossible for her to function in even a low-stress work environment.*

52.    Another of Ms. Cureton's treatment providers, Dr. Salameh, agreed in May 2013 that Ms. Cureton was incapable of sedentary work because, among other things, she could not remain in a seated position for prolonged periods, nor could she stand for very long.

53.    He further concluded that Ms. Cureton lacked the stamina and concentration to function in a typical workplace on a fulltime basis.

54.    Yet again, UnumProvident was unwilling to credit these assessments that its own employees had elicited using a UnumProvident form and declined still to make a decision about continued eligibility.

55.    So, around August 2013, UnumProvident requested the

14

completion of these statements *again*, and *again*. Ms. Cureton's treatment providers remained consistent in their evaluations that Ms. Cureton could not work on a fulltime basis in even a job having a sedentary demand level because she was incapable of remaining seated for long periods and incapable of functioning in the typical workplace due to her conglomeration of conditions.

56.    And again, UnumProvident was unwilling to accept what Ms. Cureton's treatment providers had to say.

57.    So, in August 2013, the UnumProvident claims team (through "Unum Group") tasked HUB Enterprises, Inc. with the administrative function of surveilling Ms. Cureton as part of what was now a very long investigation into continued benefits eligibility.

58.    This surveillance showed Ms. Cureton to be as inactive as her treatment providers repeatedly said she was, and showed very little activity over the course of the period during which surveillance was conducted.

59.    UnumProvident then *again* sent forms to Ms. Cureton's providers, but again her providers remained consistent in their assessments and reports.

15

60.   During this time, UnumProvident remained intensely interested in whether Ms. Cureton was going to be successful in her now-submitted application for SSDI, and in October 2013, required her to execute an SSA authorization -- which she signed and returned -- permitting the company to obtain all her SSA records, including all assessments, award information and decision information.

61.   Ms. Cureton continued to keep UnumProvident updated on the progress of her SSA proceedings at every step.

62.   At no point during this process did UnumProvident ask her to obtain a copy of her SSA records or materials upon which the SSA would rely in considering her eligibility for SSDI.

63.   Fourteen months after indicating it had initiated a new review into Ms. Cureton's eligibility for continued benefits, UnumProvident still deferred making a determination.

64.   As the "change-in-definition" for disability approached, UnumProvident issued a "reservation of rights" letter continuing payment through April 2014.

65.   When April came, the UnumProvident claims team proceeded with a determination that Ms. Cureton remained eligible for benefits

based on behavioral symptoms (which meant only two years of payment under the Plan), but still stopped short of deciding whether she remained eligible for benefits based on her physical conditions.

66.   In June 2014, UnumProvident finally moved forward with a new determination as to Ms. Cureton's physical conditions and brought its ponderous 15-month review of the same to a close, finding as follows (highlighting added for emphasis):

Recommended Action: Transfer to EBC
Request: Fuller, Ian M 06/19/2014 13:25:30: CID previously approved as M/N and
physical R/L's supported beyond CID. Per most recent 6/19/2014 forum, R/L's that
preclude any sustained capacity due to EE's multiple comorbid physical conditions
of chronic adhesive disease, chronic UTI's, pelvic prolapse and fibro are supported
and likley to be long term. Recommend transfer to SB for ongoing management with
flup in 12-18 months.

BH R/L's would also remain supported from 8/1/2012 through 24 month BH max.

Financial: EE working with attorney on SSDI. No other offsets, EE would be eligible
for FSS and PSS. Pension is 401k/403b, both are not offsets under the policy. Will
offer GENEX assistance if EE does not have attorney still.

Voc: N/A as R/L's that preclude any sustained work capacity are supported.

67.   After finding Ms. Cureton to remain disabled, UnumProvident's interest in her SSDI took center stage. Over the next year, UnumProvident consistently requested the status of that proceeding in letters not just to Ms. Cureton, but to her SSA attorney too.

68.   In June 2015, Ms. Cureton called UnumProvident to advise that the SSA found her unable to perform any gainful activity in the

17

national economy and thus entitled to SSDI.

69.   UnumProvident then set in motion the collection of its calculated overpayment of past benefits.

70.   Ms. Cureton and her husband committed to UnumProvident to repay the money in full, and although it was financially painful for them to do so (Mr. Cureton had to take a "hardship withdrawal" from his retirement account), they paid it back in full.

71.   UnumProvident then completely lost interest in Ms. Cureton's SSDI award after its offset/overpayment recovery, because at no time did UnumProvident ever issue a request to the SSA for Ms. Cureton's SSA file or request Ms. Cureton to procure it herself despite its profound relevance to her claim under Eleventh Circuit law (and ERISA law nationally).

72.   At the same time UnumProvident lost interest in the SSDI award, with its overpayment entirely collected in March 2016 it moved quickly to undertake a new review beginning around March 2016 to terminate and close Ms. Cureton's claim so that no further benefits would be paid to her – even after finding as recently as September 2015 that she was still disabled, stating:

Direction: Due to EE's ongoing pain and need for assistance with multiple ADL's, it is unlikely she has the FC for RTW. File to remain in Core for annual monitoring.

73.   After a review lasting just over three months this time, UnumProvident found Ms. Cureton's claim to merit termination and closure despite there being no meaningful difference in the medical evidence and assessments as of September 2015 as compared to such as of July 2016.

74.   It also reached this determination plainly aware of Ms. Cureton's favorable SSDI award and with full access to the same because of Ms. Cureton's executed SSA authorization but *without* the underlying SSA information. So, when UnumProvident attempted to draw a distinction between its own decision and the SSA's in its customary boiler-plate format as it always does for each and every claimant, it did so not even knowing what the SSA decision said or what the basis of that decision was.

75.   Ms. Cureton thereafter timely appealed the termination and closure of her claim on January 19, 2017 and included additional information consistent with the fact that her conditions have not improved in any respect.

76.   Further, after she appealed, she advised UnumProvident that

she had recently received another determination from the SSA that found her disability to be continuing. She advised UnumProvident that the SSA reviewed her "entire disability status with all [her]medical providers and records" in reaching their determination and sent a copy of the letter she received to UnumProvident (which is in Ms. Cureton's claim file together with this message).

77. Again, UnumProvident exhibited no interest in the SSA information and did not request it either directly as it was entitled to do or from Ms. Cureton herself.

78. UnumProvident made quick work of the appeal and denied it in a letter dated April 21, 2017.

79. Interestingly, in a final adversarial and blatantly non-fiduciary act, in the claims notes leading up to that denial, UnumProvident's claims handlers openly discussed not considering helpful information deeming it "untimely" even though the information was received before the final decision was made.

80. Ms. Cureton first retained counsel after the denial of her appeal.

81. Following that denial, counsel issued a request to

UnumProvident seeking all "relevant" documents as that term is defined in Department of Labor Regulations governing adverse ERISA benefit determinations.

82.    Documents provided since the denial establish numerous breaches and errors committed by UnumProvident while administering Plaintiff's claim, including:

(a) The targeting of Plaintiff's claim for denial because ERISA governs;

(b) The failure by UnumProvident to take any meaningful measures to insulate its claims process from its inherent conflict under the Supreme Court case *Glenn v. MetLife* and instead allowing its profit motive to influence its claims administration for Plaintiff;

(c) The withholding of relevant documents and information from Plaintiff throughout the claims process and depriving Plaintiff of the ability to obtain a full and fair review of her claim;

(d) Taking an adversarial posture against Plaintiff instead of a fiduciary posture by searching for ways to avoid paying part or all of her claim;

(e) Failing to conduct an adequate investigation, and not considering and/or according proper weight to relevant, supportive information;

(f) Failing to accord any weight to Plaintiff's medical providers who personally examined the Plaintiff on a regular basis, and instead relying only on nurse reviewers who are unqualified to overrule such physicians;

(g) Failing to adhere to the terms of the Plan, such as those governing the review of adverse benefit determinations, when a decision must be made;

(h) Purposefully limiting and curtailing the review of its medical consultants and otherwise improperly exerting influence on them to opine against payment of benefits;

(i) Unreasonably and arbitrarily overruling the professionals who personally examined Plaintiff;

(j) Failing to give Plaintiff's claim a full co-morbid review and give any consideration to how her conditions impacted one another;

(k) Failing to give proper consideration or weight to Plaintiff's SSDI award and disability finding, especially as to the award's vocational component finding her to be unable to perform any gainful activity throughout the national economy; and

(l) Unreasonably and arbitrarily overruling *its own* prior determinations that Plaintiff was permanently disabled without there being medical evidence of substantial medical improvement in Plaintiff's conditions.

83.   As set forth above regarding UnumProvident's fiduciary breaches, UnumProvident's claim decision was the product of a conflict of interest whereby it allowed its own financial interests to supersede its fiduciary obligations to Plaintiff.

84.   Employees who were responsible for the administration of Plaintiff's claim for benefits are eligible to receive bonuses and awards based at least in part on company profitability.

85.   Further, employees who had supervisory involvement and authority over Plaintiff's claims process participate in Unum Group Corporation's management incentive compensation program.

86.   Employees involved in the administration of Plaintiff's claim also participate in Unum Group Corporation's performance recognition program.

87.   To receive bonuses or awards under either the management incentive program or the performance recognition program, Unum Group employees must meet certain criteria.

88.   Satisfaction of the eligibility criteria for these programs is impacted at least in part by the denial and/or closure of claims like Plaintiff's.

89.   Unum's history of abusive claims practices reaches back for many years and includes documented policies of instructing, encouraging or incentivizing employees responsible for claims administration to deny claims, especially when that claim is found likely to be subject to ERISA.

90.   This strategy finds its inception in what has become known as the LeBeouf Report.

91. The LeBeouf Report and internal documents relating to the same established a strategic approach that included an "ERISA Task Force" created by UnumProvident for the implementation of standardized claims practices that encouraged employees to consider the applicability of ERISA during the administrative process and then to target such claims for potential denial to "take advantage of ERISA protection."

92. In an October 2, 1995 memorandum, UnumProvident management-level employee Jeff McCall assessed the opportunities afforded by ERISA's application to aggressive handling of claims as follows:

> The advantages of ERISA coverage in litigious situations are enormous; state law is preempted by federal law, there are no jury trials, there are no compensatory or punitive damages, relief is usually limited to the amount of the benefit in question, and claims administrators may receive a deferential standard of review. The economic impact on Provident from having policies covered by ERISA could be significant. As an example, Glenn Felton identified 12 claim situations where we settled for $7.8 million in the aggregate. If these 12 cases had been covered by ERISA, our liability would have been between zero and $0.5 million.

> The key for determining the applicability of ERISA is whether or not the employer "sponsors" or "endorses" the plan. If the employer pays the premium, the policy would usually, but not always, be considered to be governed by ERISA. Salary

allotment or payroll deduction arrangements, by themselves, do not necessarily mean that a policy is subject to ERISA. While our objective is to pay all valid claims and deny invalid claims, there are gray areas, and ERISA applicability may influence our course of action.

Memorandum of Jeff McCall (a copy of the foregoing memorandum is included in Plaintiff's ERISA administrative record).

93.   Between 2002 and 2004, Unum was subjected to investigation by several state departments of insurance.  The announced purpose of that investigation was "to determine if the disability income claims handling practices of [UnumProvident] reflected systemic 'unfair claim settlement practices'" in violation of various state insurance laws.

94.   Upon completion of the investigation, examiners found many abuses, including unfair construction of evidence and evidentiary or contractual requirements for proving entitlement to benefits.  (A copy of the foregoing document is included in Plaintiff's ERISA administrative record).

95.   After completion of this multi-state investigation in November 2004, Unum entered into a Regulatory Settlement Agreement ("RSA") whose terms required it to pay a substantial fine and to amend its claims practices.

96.   UnumProvident, however, did not faithfully comply with the terms of the agreement, and instead engaged in an effort to better camouflage its pre-RSA claims practices.

97.   Not long after its execution of the RSA, UnumProvident instructed its employees to continue to decide claims as they had done previously, notwithstanding UnumProvident's forthcoming revision of its claims procedures to satisfy any future inspectors.

98.   As part of this resumption of its pre-RSA activities, UnumProvident continued its incentivization programs aimed at closing claims and obtaining "recoveries" for UnumProvident in the form of released reserves.

99.   UnumProvident employees at the claim administration level continued to take part in a company bonus system and award program tied to company profitability.

100.   UnumProvident employees at the claims level also continued to be evaluated on a regular basis for their efforts to achieve goals connected to the enhancement of corporate profits.

101. As set forth above, to receive bonuses or awards under either the management incentive program or the performance recognition program, Unum Group employees must meet certain criteria.

102. Satisfaction of the eligibility criteria for these programs is impacted at least in part by the denial and/or closure of claims like Plaintiff's.

103. UnumProvident's "Manager Toolkit" shows metrics included within these criteria involve claim closure or termination numbers, liability acceptance rates, and claim reopen rates.

104. These values, individually or in the aggregate, may influence the award of performance compensation or consideration of corporate advancement opportunities.

105. UnumProvident even explicitly directs its management employees to filter information to those reporting to them, so their interests likewise justify with those of the overall company.

106. As UnumProvident's documents make clear, the more an individual or unit is perceived as contributing to the meeting of UnumProvident's financial goals, the greater their share of the bonus pool.

107. UnumProvident also actively tracks the pursuit of goals for closing claims or recovering or conserving reserves on a regular basis and consistent basis through Weekly Tracking Sheets.

108. According to Unum's claims procedures pertaining to IDI milestone reviews, these goal documents are made available to the claim directors, the very individuals charged with deciding whether claims will be approved or denied and whether open claims will be terminated.

109. UnumProvident also uses a "balanced business scorecard" approach at the director level to ensure claims personnel remain informed throughout the year on whether the company is meeting the financial goals necessary for the availability of bonus or incentive compensation.

110. These scorecards are among those documents evidencing the continuation of Unum's earlier pre-RSA claims practices; other Unum documents have also specifically referenced goals, expectations, projections and targets for closures.

111. This active conflict of interest under which UnumProvident employees operate further calls into question the credibility of

UnumProvident's claims personnel and reviewers, such that no deference to the decision made here should be accorded.

112. UnumProvident considered the applicability of ERISA before making its decision. This presents an additional reason for application of a *de novo* standard to their claim decision, and to excuse the Plaintiff from further utilization of UnumProvident's claim process.

113. UnumProvident did not provide Plaintiff with a meaningful opportunity for a full and fair review of her claim for benefits as required by 29 U.S.C. § 1133 and 29 C.F.R. 2560.503-1.

114. UnumProvident's decision process has not comported with 29 U.S.C. § 1133's requirement that any notice of the denial must contain the specific reasons for such denial, written in a manner calculated to be understood by the participant, and must comport with Department of Labor regulations.

115. Plaintiff has exhausted all Plan remedies even though UnumProvident's failure to adhere to Plan terms or ERISA requirements and regulations did not require it. As such, this case is ripe for judicial review.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Amanda Cureton respectfully requests this court find jurisdiction and venue appropriate, and after trial, grant the following relief:

a.   Award Plaintiff past benefits due and payable under the terms of the employee welfare benefit plan/insurance policy(ies) and/or pension plan pursuant to 29 U.S.C. § 1132(a);

b.   Enter a declaratory judgment as to Plaintiff's entitlement to future benefits and an appropriate order directing the Defendants to pay all similar claims of Plaintiff in the future pursuant to 29 U.S.C. § 1132(a);

c.   Should the Defendants voluntarily pay all past due benefits, enter a declaratory judgment as to Plaintiff's entitlement to future benefits, along with entering an appropriate order directing the Defendants to pay similar claims to Plaintiff in the future, or in the alternative, for the Court to remove Defendants from their fiduciary roles in the administration of The Plan(s), and to appoint a special master at Defendants' expense to substitute for these entities with the special

master having the authority to make all determinations as to Plaintiff's entitlement to future benefits;

d.      For a judgment against the Defendants awarding Plaintiff prejudgment interest, costs and expenses, including the reasonable attorney's fee as permitted under 29 U.S.C. § 1132(g)(1);

e.      For an order enjoining the Defendants from further breaches of fiduciary or co-fiduciary duties, and direct that Defendants exercise reasonable care, skill, prudence, and diligence in the administration of Plaintiff's claim;

f.      For an order pursuant to 29 U.S.C. § 1132(c) awarding Plaintiff $110 for each day beyond the Defendants' due-date for responding to Plaintiff's ERISA production request;

g.      For an order requiring Defendants to provide Plaintiff with any additional benefits to which the Plaintiff would be entitled pursuant to a finding that the Plaintiff is disabled under The Plan(s), including waiver of premium benefits under other policies/Plans that Defendants have administered; and

h.    Such other relief as may be deemed just and proper.

Respectfully submitted,

M. Clayborn Williams
(ASB-9101-A43M)

**The Martin Law Group, LLC**
**Attorneys for Plaintiff**
P.O. Box 20087
Tuscaloosa, AL 35402-0087
Phone (205) 343-1771
Facsimile (205) 343-1781
clay@erisacase.com

**<u>Plaintiff's Address:</u>**

Amanda Cureton
c/o The Martin Law Group, LLC
P.O. Box 20087
Tuscaloosa, AL 35402

**<u>Defendants' Address:</u>**

Corporation Service Company, Inc.
Registered Agent for UNUM Group Corporation
641 South Lawrence Street
Montgomery, AL 36104

Eglin Federal Credit Union
838 Eglin Parkway NE
Fort Walton, Florida 32547-2781